Case number 20-1493, DTE Electric Company et al. Petitioners v. Federal Energy Regulatory Commission. Mr. Wolf for the petitioners, Ms. Pescella for the respondents, Ms. Valley for the interviewer. Good morning, your honors. May it please the court, I'm Eric Wolf for petitioners. I really appreciate being able to be with you in person here today. This is about discrimination in electric storage regulation, discrimination without adequate explanation as to its reasonableness, and without adequate explanation as to how it fits within FERC's past policy statements. So I realize in going through the briefing to prepare for this that to some extent the parties kind of talk past each other on some of the background issues. And so I'd kind of like to step back a little bit, give some of that background, and then get right into the discrimination that's occurring and why we don't think it's adequately explained or justified. So as you know, the world of the electric grid going back to the 1990s is divided between generation and transmission. And on the transmission side, these are the old local monopolies, wires, transformers, things like that. They get those regulated rates. They get a guaranteed rate of return. On the generation side, they now have to, you know, have market pricing. More competition should be better for consumers. Everybody agrees that that's the basic breakdown. That's the basic policy. And everybody agrees that electric storage sits in between that. So if you have a battery, it can put power onto the grid like generation. It can also take power off the grid like a wire. So it sits in between. So how do you regulate it? And the other thing about electric storage is it's important. It's a developing technology, and it's particularly significant for alternative energy because you need power generated by wind or solar or something like that. If you have better batteries, if you have better storage, then those alternative energy sources become a lot more feasible. You can get their power into the grid. So it's very important to get this right. So what we have here, mid-continent, Alberta to Louisiana, the operator is allowing these storage projects by the old local monopolies to get those transmission regulated rates, guaranteed rate of return. Now, here's how it's discriminatory, and this is where I think the parties— Thank you, but could you just explain to me, so mid-continent's done that on the theory that a battery could be used for either transmission or generation, correct? In other words, you could use it either way. Is that right? Well, here, what they're doing is they're saying the transmission owners can put in—and I'll just say battery because it's easier to think of it as a battery—can put in a battery, and if it's transmission only, then they can get that transmission rate, guaranteed rate of return to cover all their costs on that. Right. And that is discriminatory because the transmission owners have a right of first refusal on those projects. But not as a result of this particular plan. That was the pre-existing background rule, right? Correct. That's a pre-existing tariff. So that tariff actually, that went up to the Seventh Circuit, and just candidly, Your Honors, I wish we'd put more of the Seventh Circuit opinion in here because it is helpful background. What they did in that order said for the larger transmission projects, those are going to be subject to competition, but for what are called baseline reliability, the transmission owners, the old local monopolists, they have a right of first refusal. And as Judge Posner explains in that opinion, they're always going to do these projects because they know they can recover their costs. They know they can get the rate of return. So that was with respect to just transmission, like old transmission, like wires. So what happened here is the transmission owners and the operator, MISO, they said, well, we're just going to treat these storage projects, if they're helping transmission, we're just going to treat them like wires. And maybe there's some explanation that can satisfy that. The preference for incumbent transmission owners is, it's not simply in this tariff, it's baked into Order 1000 itself, right? Yeah, you can think about it that way, but it's baked in there. That's basically old transmission. I mean, that's wires. And one of the conditions in this case, one of the conditions for the storage entity to be treated as, to be regulated on the transmission side, rather than the generator side, is that the project has to meet an identified transmission need. Correct. So if the storage facility is functioning as a transmission facility, if it's meeting a transmission need, it's treated as a transmission facility. We're not challenging that you can have one of these projects and treat it as a transmission. That's not our challenge. Our challenge is, you can't allow the transmission owners who have this right of first refusal on these projects, these very projects, baseline reliability, when they're going to use storage, they need to explain why you can let them have that competitive advantage. These are the local monopolies. Going back to Judge Jackson's first point, that's baked into the system that ISO has grafted this onto. That's part of the system. The right of first refusal. Correct. And since you're not arguing that batteries can't be used for transmission, I don't see. I don't see why that that issue is even raised. Well, it's, it's being raised because, I mean, this is a section 2055. Yeah, so they come forward, they and they're, they are discriminating. So they have given a competitive advantage for the transmission owners. You've got this new thing called storage. That's a pre-existing competitive advantage. Not for storage, not for storage. That's true. So now, like, we have rules for transmission. Then we have a question whether we're going to treat storage as transmission. Why does the right of first refusal create a problem for battery storage and not for other forms of transmission? Well, creating the problem for battery storage gets into the separate policies related to storage and the fact that storage is generation. And we, and FERC wants competition on the generation side. And in the past 10 years, FERC has been very sensitive about how to treat storage because it can generate. It puts power into the system. Right, but the cost recovery piece of this, which I think is what you're worried about, only applies when it's being used for transmission. Right? In other words. You're right. So, even though it has the capacity, the battery you're talking about, the storage facility you're talking about, has the capacity to be used either way, transmission or generation. It sounds as though you're okay with the overall determination that it can be used for transmission, but you don't want them to have the legal preexisting benefits that go with use as transmission. Absolutely. Absolutely. I don't understand why that's the case. Because if you accept that they can use this as transmission, then why don't they get all of the other benefits that go with use as transmission that the wires get? Because they're not competing and they could compete. And we know there's competition on the storage side. And so all we're saying is, if you're going to let storage projects qualify for those transmission rates, you cannot just privilege the incumbents. You cannot treat them the same as the wires with respect to transmission. Correct, because they're different. Because they're different. Why are they different? That's what I don't understand. Yes. That's why I asked you that question right at the beginning. Why are they different? So, they're technologically different. They're what? Yeah, I know. But in terms of their function, they're – well, you go ahead. I'm sorry. So, FERC has recognized this in other cases. There's reference in the briefing to the American electric power case. Because it puts power into the system. And this is why one of the commissioners dissented. So, there's that technological difference.  It's not just a wire. And in this particular situation, they are allowing the incumbents to oversize these storage projects. So, baseline reliability might be a relatively small project, but they're going to put in big storage. But they can't use it for generation. They can't use it yet. Well, but so, yet is the key thing. Right. The issue is not before us. But the competitive advantage here is significant. So, they have this process for the old kind of transmission projects, wires. And they just put this into that line. And then they put everybody else into what they call generation interconnection. That's a different line. And nobody disputes that that line is more onerous. It's going to take longer. And it is not realistic to say, well, you know, maybe you could come through that project or that line. And what you have to offer in the marketplace, it could come in that door. It will never come in that door. They have given this to the local monopolies. And that's something that for 25 years FERC has been suspicious of. And the Seventh Circuit's opinion is quite good on why we should be suspicious of the local monopolists. Because they're always going to reach for these things. They're always going to want to find ways to increase their footprint and to leverage their local monopoly. And so, this is a 205 filing. It is their burden to explain why they should be able to discriminate in this way and why it's consistent with past policy. And to just treat this as if it's wires, to not recognize the distinction with storage being generation, to not recognize that there is competition in storage. Wouldn't your solution create just a different form of discrimination? In other words, you would be treating batteries used for transmission differently than other transmission facilities because the batteries wouldn't carry with them this right of first refusal. So, you would just have the transmission owners claiming discrimination, wouldn't you? I don't know how they could claim that because it would just be in the technology, not the party. So, we want equal… Okay, no, I understand the technology is different. I get that. But if the battery is being used for transmission, does it make a difference? In other words, transmission is transmission, whether it's by wire or through a battery. And I didn't hear you arguing that batteries can't function, can't perform a transmission function. Anybody's batteries could, Your Honor. That's the critical thing. Yeah, all batteries. We just want equal access. Okay, all right. I'll come back to you on rebuttal unless you want to… No, no, you… Did you have anything else? Anything else? Okay. Well, you had other arguments. So, discrimination gets one. You said something about failing to consider alternatives in a way… Yeah, so let me speak to that very briefly, Your Honor. The only real explanation, they really kind of have two explanations that they offer. One is you can't go there because the right of first refusal is baked in, and we're just going to keep it and treat this as if it were a wireless project. And that doesn't adequately explain how you're treating this new technology where you've preferred the marketplace. But the other is the potential competitors who might create that competition, lower prices to consumers, well, they're not part of the operator's agreement. And on that, they don't explain why you couldn't just have an agreement with an entrant. And there's not much to say on that because they literally have no explanation of why you couldn't just have an agreement with an entrant. The operator's agreement… So, they considered this regulatory scheme to consider alternatives? I thought that was their argument. Are they wrong about that? They will consider alternatives among how to deal with a transmission problem. So, they identify a transmission problem. They'll look at alternative ways to do it. Storage might be one way to fix it. You do have from the incumbents in their intervention brief, you have these sort of sweeping statements that like, well, it's available on equal terms and things like that. That's very artful because, you know, you could submit, a non-incumbent could submit some idea, a proposal. But given the right of first refusal, and again, the Seventh Circuit's opinion is very good on this. Given the right of first refusal, the incumbent's going to do it every time. They get a guaranteed rate of return. So, that you sort of can equally, you know, to say, oh, you can equally propose something, that's not realistic. That's not pragmatic. And our side are the non-incumbents who can compete for these projects, who just want equal access, and don't want to have to go to a separate line that's going to take longer. It's got more cumbersome review. And they have to justify that discrimination. I'm sorry, it sounds like this alternative point is the same as your discrimination point. Is that really all we're talking about? I think it all kind of comes together. It all comes down to that. Okay. Okay. Thank you. Thank you. We'll hear from her. Good morning, Your Honors. Beth Mosella for the commission. I'll start off with the point on the right of first refusal. So, as the court seems to understand, the right of first refusal doesn't come from these orders. The right of first refusal comes from Order 1000, and also from specific FERC orders approving the right of first refusal for the baseline reliability projects that was not only approved by FERC, but also approved by the Seventh Circuit. But I hear him saying, at a very baseline level, although that was the existing state of affairs with respect to the right of first refusal for transmission projects, we now have this new technology. And FERC has essentially allowed for the right of first refusal and incumbents to monopolize this new frontier because MISO has set the plan up in this way. So, can you speak to why the plan is stale from a discrimination standpoint, not in the particulars of right of first refusal, but sort of conceptually? Why is the MISO plan acceptable from a discrimination standpoint at that level? Well, because entities that are eligible under these criteria to serve as transmission to satisfy transmission need are not similarly situated, Your Honor, to entities that are not. So, when you, for example, if you look at the tariff provision, FF, in Attachment FF, Section 2G1C1B, which is a JA-266, which is the requirement that a transmission-only asset, you can't be a transmission-only asset if you could serve the transmission need as a generation asset through the markets. So, if an entity, if a battery, for example. Excuse me. Can you just explain what you just said? Yes. So, what that means is what the, as the commission explained in the second order at JA-723, Paragraph 29, Mid-Continent will evaluate a proposed transmission-only asset both as a transmission solution and as a market resource. And if it can satisfy the transmission need as a market resource, which means it's acting as generation, it cannot be a transmission-only asset. And it will not get cost recovery or a right of first refusal or anything like that. None of that will apply. Okay, but if it does qualify as a transmission-only option, then let's go back to Judge Jackson's question, which is that that part of the market, this huge new important, huge new technology in our country for. I'm sorry, I'm having trouble hearing you. I'm sorry. That's all right. We're all getting used to this new world here. They couldn't hear me even before masks. So, the point is that the argument they're making is that this, with this major new important technology. With respect to batteries that can only perform the transmission function through transmission, the right of first refusal allows the traditional transmission system to monopolize that market. It's anti-competitive. I'm sorry, I missed the last part. It's anti-competitive. It allows the incumbent transmission operators. So, that brings me back. So, in other words, you'll never have. Why would you ever have a, in other words, if a battery can qualify as transmission-only, why would it ever be offered by a non-incumbent? Wouldn't the incumbents always exercise the right of first refusal? Well, it's not always going to be true. The commission did say it's most likely to be a baseline reliability project. So, it is possible that there could be another project. The commission did not foreclose that. But for purposes of discussion, I'm happy to assume it would only be that. Yeah. Because that's, you know, the scenario that a petitioner is interested in. And so, let me bring you to what the commission said in Order 1000. The commission said there it directed transmission providers to remove rights of first refusal for only certain types of projects, not for all of them. Reliability local projects are not included. And the reason for that is, as the Seventh Circuit explained in approving the baseline reliability project right of first refusal here for Mid-Continent, it said FERC's justification for this departure from the order's emphasis on promoting competition is the benefit, which is surely very considerable, of a quick resolution of reliability problems. So, the commission absolutely in Order 1000 was promoting competition. But it understood that with certain types of projects, here reliability projects, it's too important to ensure quick resolution of reliability. Can I just sort of state back what I think? I hear you saying, and you can tell me if I have gotten it. Yes, Your Honor. The reason why this isn't a market monopoly and competition problem is that we only get to this world of storage as transmission and the incumbents getting the first right of first refusal after we have evaluated all other possibilities for solving the problem. That's exactly right, Your Honor. So, the other folks, the new folks, if they've got a better solution before we get to, okay, we've really got to deal with this, guys, right? Then they can come in in the market on the front end because we're looking at all options first. That's exactly right. Only after we've taken care of all other options do we then look at this. Now we've got to really do something about it, and we're going to give the incumbent the right of first refusal. That's exactly right, Your Honor. Is that right? That is exactly right. And as the commission explained in the second order at a number of places, if either a wires, a traditional type of wires transmission solution is equally able to deal with the transmission need, they will choose the traditional wire solution. If a non-transmission alternative is equally able as a transmission-only asset to satisfy the need, the transmission need by displacing the need for transmission, then that will be chosen, the non-transmission alternative will be chosen. So, this is really a last resort thing, and the record also shows that the Mid-Continent fully expects this to be a very, very rare circumstance, particularly because it's only going to apply for these very extreme circumstances, an N2 contingency or a stability issue. If it's just an N1 regular thing that can be done through congestion management, a transmission-only asset cannot be approved. So, it's a very limited circumstance. And the non-transmission alternatives commission explained will be considered exactly as before. There's no change here. So, if Petitioner were right that they'll never get through the generation interconnection process to be able to be considered, that's true for any generation. The generation interconnection process takes as long. That's not because of these orders, just like the concern about the right of first refusal. These orders do not change that. Transmission is treated as transmission under these orders, and those are similarly situated, and it would cause an undue discrimination problem if the commission treated transmission differently from transmission here. The generation is not the same as transmission, and storage in the markets is generation. It is not transmission. On the point about alternatives to the Transmission Owners Agreement, I mean, the case law is very clear on this point. In El Paso Natural Gas 966F3rd at 857 and 864, this court explained, and I said this in my brief, the commission has to accept a rate proposal if it finds it just and reasonable, regardless of whether there are alternative proposals that might also be just and reasonable. So, once the commission determined that Mid-Continent's proposal was just and reasonable, it did not have the opportunity, didn't have the option, even if it wanted to, to say maybe there's some other type of contract that Mid-Continent could come up with. As the commission found, there's already a contract that exists. It's the foundation of the Mid-Continent system in the first place, and that's what ensures that projects will be constructed if they're needed for reliability, and it ensures that functional control will be transferred over to Mid-Continent so that it can run the system securely and reliably. Can I ask you a question, though, about the alternatives point? Because, I mean, it seems pretty straightforward in the way that you put it, but then we also have under the APA the requirement that an agency provides a sufficient response to concerns that are raised about the determination. That's right. And so when you have a situation like this one, if the interested party says in their comments to you as you're reviewing this, here are all the other feasible ways. This person is saying this in the contract. What about this kind of contract? What do you view as FERC's role in actually evaluating the proposal that they put forward? Like, how do you deal with those two different duties? Yes, I hear you, Your Honor. Let me first say no type of contract was proposed here, and that's just a side point. Okay. They were just like Mid-Continent can come up with some other kind of contract. I see. So that's my first point. But secondarily, in the usual circumstance, and of course the Commission has to consider alternatives in other kinds of cases, but here where the Commission is not allowed to consider, this is the Commission's answer to their alternatives point. We can't even look at it. We just can't look at it. It's not a situation where the Commission has the option to say, oh, which one do we like better? The Commission is bound to accept a Section 205 proposal if it finds it just unreasonable, and it just doesn't have the option. So it could, I guess, have spent time writing some dicta on why that isn't a plausible answer, but that would just be dicta, and it certainly isn't necessary to satisfy the APA obligation here. Thank you. One other question that might take us a little far afield. I know you just have a little bit of time left. Could you explain sort of as a practical matter how a storage facility serves a transmission? What does that mean to have decided? Well, here I can answer that very specifically. Here we know, and again, as I was explaining before, when someone proposes to be a transmission-only asset, the system operator doesn't just take their word for it. They test it. They analyze it. If you're acting in the market, this is what would happen to satisfy this transmission need, and if you can satisfy that transmission need, then that's the end of the story, and you don't go any farther. They also test it as transmission, and the key here is the difference between N1 and N2 contingencies. So the market works, and my co-counsel here probably understands this better, but my understanding of it is the market works, that there are contingencies that you can do congestion management with generation and say, I guess we want to have you run some additional generation in now, or we can have you pull some, you know, don't run your generation now. That's the normal scenario, non-emergency situations, but when you get to an emergency situation, they just don't have the capability. It's just not done in the market. It just doesn't work that way, so when you get to an N2 contingency or a stability issue, those are items that cannot be addressed through the market, period. That's what makes this a transmission issue. And then you bring in the battery. You bring in the battery to act as transmission under the system operator's control is a big important part of that as well, that it can only be done under the system operator's control. How does the term voltage support fit into it? Two terms, voltage support and thermal overload. Are those critical terms for this extension? I hate to say that I don't, because that wasn't fleshed out in the record here. It's just part of the commission's precedent regarding that in the Western Grid case. Those are the specific items talked about, but it really wasn't fleshed out, and I apologize. I don't have it. That's okay. So just to pursue Judge Jackson's question, what is it about the particular? Can you give us an example of a situation where a battery is appropriate for transmission? I just go back to the same point that the commission addressed and is in the record here, and that's why the commission had the Mid-Continent add this to their tariff provisions, that a transmission-only asset will only be approved if it is needed to satisfy an N2 contingency or a stability problem. Okay. I just don't have any more information. That's actually helpful. Thank you. There's nothing further? Anything else? Okay. Well, we'll hear from the intervener then. Thank you, Your Honor. Thank you. May it please the Court, I am Carrie Valley, appearing on behalf of Interveners for Respondent IRC. You're going to have to speak up. I'm sorry. And I can take this off. If you would like to, yes. Thank you. May it please the Court, I am Carrie Valley, appearing on behalf of Interveners for Respondent IRC. And I'll start by addressing the questions that the Court was just asking in terms of how does this serve that function, and it is in that unique circumstance. It is not that initial market congestion issue. It is not an N-0 or N-1. It is beyond that where this is uniquely situated. And I think that probably the best way to describe it is even just to refer to the Court to the record elements that addressed it. We have one project. It's the Wapaka project that was approved. We discussed that at length in JA618 to 619. And we also addressed those unique circumstances. Could you just tell us what that project is? Just explain it, like give us three sentences. It is a 2.5 megawatt battery located in an area that essentially reduces the contingency for unintended load loss under multiple contingencies. And so rather than if it wasn't there, you'd have to address it through an operational issue that could result in load loss and radializing, which is segmenting those loads. And to avoid that, this battery can avoid that issue by serving as a transmission function. There are other sort of resources that do these sorts of actions as well in terms of voltage support, avoiding load loss. And this is uniquely situated to address that here. And getting back to some of the Court's questions about how this works, how is it selected as the unique circumstance or solution and how that fits into the project categories. So the Mid-Continent has an annual expansion planning process. It lasts 18 months. What is first identified is the transmission issue that needs to be resolved and then the possible solutions for it. And multiple parties and stakeholders can present possible solutions. Mid-Continent's role is to identify the preferred solution. Once that preferred solution is identified, then the project classification attaches. So whatever that is, once the solution is there, then we looked at the project criteria to determine how it will be allocated and where the construction obligation attaches. So at what point in the process that you just identified is the determination that we need storage as transmission? Is it in that last step or is it as part of what is the solution? It is part of what is the solution. So when we are identifying whether it is the preferred solution to address a transmission issue, it is evaluated independent of project classification solely whether it is the preferred solution. What is project classification? That is whether it is a baseline reliability project, other project, or meets that classification for competitive development that exists independent of this market efficiency project or multivalue project. If it landed in one of those project categories, it would be subject to competitive development just like any other transmission solution that also met that project criteria. Can I just have one more second on this? So we have a problem, guys, you say at the beginning. Here is the circumstance that we are talking about. Let's hear all the possible solutions. At that point, one of the solutions is storage as transmission as opposed to something else. That's what I heard you say. Yes. And if you decide, so in that, but you only get to storage in transmission, I understood to be the preferred solution after you have looked at other market. Right. So you look first at the other existing kinds of ways to deal with this, and it's the last resort we go to storage as transmission. And then once you're in the storage as transmission, is that when you do regional versus local or whatnot? Right. So once we identify this is the solution, then we look at the project criteria of how you classify it. Then that will attach at that point, but not at the determination of what the solution is. It's more after the fact of how do you classify it now that we've identified what the preferred solution is. And within that classification, to the extent that you make it a regional thing or a broader thing, there could be market competition for the storage as transmission in that. Yes. At what stage, at what stage in this process? Were you referring to N1 and N2 before? Yes. Huh? Yes. N1 and N2? Yes. Okay. At what point in the process is a problem cataloged as N2? That is one that can only be solved by transmission. My understanding is that's part of the overall planning process. What is the solution? How does it get categorized? What are we trying to address? And in this particular circumstance with the WAPACA project, that was what was being addressed. It wasn't that N-1, it wasn't N-0, which may be able to be served by something operating as a market resource. It's only in that unique circumstance going beyond that where it needs to operate as transmission only. Okay. One more question. So once a problem is identified as an N2 problem, then by virtue of the right of first refusal, it's only going to be the only entities that will be able to do that, right, are the incumbent transmission only, right? If it doesn't meet the criteria for a market efficiency project or multivalue project. Okay. Got it. Thank you. We took up all your time with our technical questions. Did you want to take one more minute? And did you have one other thing you wanted to say? Thank you, Your Honor. I think we addressed the critical issues here. Okay, great. Thank you. Mr. Wolf, I think you were out of time, but you can have two minutes. Thank you very much, Judge Steele. I'll just respond to some of what I just heard and also in response to your questions. So we got an explanation from counsel for FERC that was essentially, you know, we think that the Order 1000 rationale for the smaller wires projects, that should apply here. And, you know, so the same right of first refusal, you know, like, whatever reasoning supported in Order 1000, that should apply here as well. They did not say that in the order here. And I think they have to. And it's worth noting, and this is the first two pages of the Joint Appendix, the operator describes what's going on here as a fundamental first step forward and a fundamental shift in their policy. So if this is a fundamental shift, which the operator says that it is, then they need to explain that change. And given the innovation of storage, it deserves an explanation that it's not just, well, we're going to do it the same way we do it for these wires projects. On this issue of, well, we're going to consider everything, and only if we really need it will we do it this way where the local monopolists are going to get to use it as storage. Because of the insistence on operator control, that runs you right back into, well, you have to be a party to the owner's agreement. So it's not as if they're really considering everything. At the end of the day, they're right back to the local owners. And so it all means the discrimination is still there. It's just, is it adequately explained? We also heard from FERC counsel, well, we didn't see any other agreements or anything like that, and so we shouldn't have to talk about whether other agreements could satisfy it. That point was raised to them. They should have to respond to it. Was it raised to them with a specific other alternative contract? It wasn't raised. As far as I know, and I should be careful here, as far as I know, it wasn't as if, well, here's an agreement, you could use it. But there are lots of other agreements in this field. And their own precedent, Western Grid 2010, was a non-owner of a transmission facility who got a transmission, storage as transmission project approved. So because of the agreements that they had in place about control. So their own precedent shows how to do it. Thank you. Thank you. Thank you. All the cases submitted.
judges: Tatel, Katsas, Jackson